IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

In Re:

KUDZU MARINE, INC.,                                   Case No. 13-2935-JCO

   Debtor.

_____

DENISE I. LITTLETON,

   Plaintiff,

v.                                                    Adversary Case No. 15-148-JCO

LANAC INVESTMENTS, LLC,

   Defendant.

<u>ORDER AND MEMORANDUM OPINION</u>

     This Adversary Proceeding is before the Court on Plaintiff's Complaint, which was set for trial before the undersigned on October 17, 2016.  Appearing on behalf of the Trustee Plaintiff (hereinafter the "Trustee" or "Plaintiff"), were attorneys C. Michael Smith and Suzanne Paul; the Trustee was also present.  On behalf of Defendant Lanac Investments, LLC (hereinafter "Lanac"), was attorney Edward LeBreton.  On behalf of creditor M.B. Barge, Co. (hereinafter "MB Barge"), was attorney Robert Turnipseed. The Complaint alleges an actual and constructive fraudulent transfer of the tank barge, KDZ 1801 (hereinafter "the 1801"), by Debtor Kudzu Marine, Inc. (hereinafter "Debtor" or "Kudzu"), to Defendant Lanac. Pretrial and post-trial briefs were submitted by both parties, as well as proposed findings of fact and conclusions of law by each party.  (Docs. 49, 50, 53, 54, 55, 56, 57, 58).

The Court heard testimony from multiple witnesses including principals of the litigants and interested parties, multiple marine surveyors, and the owner of a marine repair service. The principals of the litigants and interested parties were: Steve Wilson, a shareholder of the Debtor; John Canal, principal of Lanac Investments, LLC and Bunkers International; William Gotimer, attorney and agent for Lanac Investments, LLC and general counsel for Bunkers International; Chris Gonsulin, owner of creditor, MB Barge, Co. The marine surveyors were: Christopher Collier; Mark Shiffer; Perry H. Beebe (hereinafter "Beebe, Sr."); and by deposition testimony, Perry J. Beebe (hereinafter "Beebe, Jr.");[1] and Fred Budwine. Allen Henry of Henry Marine, a business that offers marine repair services also testified. Each of the marine surveyors were tendered as experts, and the Court accepts them as such.

For the reasons set forth below, the Court finds that only constructive fraud existed at the time of the transfer because the barge was sold for less than reasonably equivalent value. In making this finding, the Court considered the appraisals submitted by the parties. Each appraisal was found to be lacking certain persuasive elements. Because each appraisal lacked factors relevant to this Court's estimation of value, and, because the appraisals considered together indicate a value above what Lanac paid for the barge, the Court was unable to assign a fair market value of the barge at the time it was sold. Consequently, the Court finds that the barge is due to be returned to the Trustee for sale at auction where the fair market value will be determined by the market. A separate

---

[1] For clarity, Perry H. Beebe and Perry J. Beebe are father and son, but they are not officially senior and junior. However, for readability purposes, the Court designates them as such. It also bears noting that they are not employed by the same appraisal firms and they each conducted their appraisals of the barge independent of one another.

order regarding the details of the auction will be entered herewith. The Court further finds as follows.

## Jurisdiction and Issues Presented

The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H). This is a final order.

The Plaintiff's Complaint asserts three causes of action: constructive fraud under 11 U.S.C. 548(a)(1)(B) based on the 1801 being sold for less than reasonably equivalent value (Doc.1 at 3-4); actual fraud under the Alabama Uniform Fraudulent Transfer Act as made applicable by Section 544(b)(1) of the Bankruptcy Code (Doc. 1 at 4-6); and actual fraud because the transfer was concealed from Debtor's creditors and the Debtor retained control of the barge after it was sold. (Doc. 1 at 6-7).

## Findings of Fact

Prior to filing bankruptcy, Debtor was a local maritime company engaged in the business of pushing tank barges loaded with fuel. According to Steve Wilson's testimony, Debtor was owned by three shareholders: Robert Tompkins (35% interest), Steve Wilson (25% interest), and Javier Brito (45% interest).[2] In April of 2009, Debtor purchased the 1801 for $1.3 million dollars. Each shareholder guaranteed the ship mortgage on the barge with Iberia Bank, and were personally exposed if the partnership failed to pay the loan. The 1801 is a steel-constructed, double skin, coastwise tank barge built in 1971 with a cargo capacity of 18,000 barrels. In order for the barge to perform its

---

[2] The Court notes that these percentages total 105%. These percentages were not objected to and the Court was not presented with any disputing evidence.

Case 15-00148    Doc 59    Filed 03/13/17    Entered 03/13/17 15:42:06    Desc Main
Document    Page 3 of 31

intended use, Kudzu had to maintain a valid certificate of inspection ("COI") with the Coast Guard, which it initially did.

The barge's prior owner had it appraised before Kudzu purchased it. Marine surveyor Mark Shiffer boarded the vessel to survey its condition and, relying on Shiffer's findings, Beebe, Sr. estimated the barge's value. Together, this formed the April 17, 2009 Shiffer-Beebe 2009 Survey concluding that the 1801 was well-maintained with a fair market value of $1.433 million and a useful life of at least twenty years. (PEX 4).[3]

Mr. Wilson testified that while Kudzu was in full operation, its main customer was Specialty Fuels Bunkering, ("SFB"), which is owned by Kudzu shareholder, Javier Brito. In turn, SFB worked with Bunkers International ("Bunkers"), in the trading of bunker fuel. Mr. Wilson stated that SFB was ninety-eight to ninety-nine percent of Kudzu's business with no other major source of revenue. To assist its business with SFB, Kudzu was obligated to MB Barge on two bareboat charter agreements of the barges, MB3 and MB7, dated December 19, 2011 and April 15, 2010, respectively. (PEX 1, 2).

Mr. Wilson testified that Kudzu never made a profit, which resulted in SFB loaning Kudzu money to make the ship mortgage payments to Iberia Bank. In November of 2011, the COI with the Coast Guard was set to expire. Without the funds to pay for the repairs necessary for recertification, Kudzu began the process of shutting down its business operations and liquidating its assets. According to the voluntary petition, those assets consisted of the 1801, a push boat named the Sandra Ann, a push boat named the Russell T, and a push boat named the Patty White. (Doc. 1 at 20). By July of 2012, Kudzu had ceased operations and defaulted on the two bareboat charter agreements with

---

[3] "PEX" stands for Plaintiff's Exhibit. Defendant's Exhibit is referred to herein as "DEX," and Joint Exhibit is referred to as "JEX."

MB Barge. Steve Wilson admitted that Kudzu breached the charter agreements, but disputes the amount Kudzu owes MB Barge as a result of the breach.

On September 25, 2012, MB Barge sent an anticipatory breach letter to Kudzu threatening to take further action against Kudzu if the chartered barge MB-7 was not recertified so that the MB3 and MB7 contracts could be executed. (PEX 5). On October 23, 2012, Mr. Gonsulin met with Kudzu shareholders Steve Wilson and Bobby Tompkins in New Orleans in an effort to resolve MB Barge's potential breach of contract claim against Kudzu. During those negotiations, Mr. Gonsulin proposed that MB Barge could secure a buyer of the 1801 and the push boat Russell T who was willing to pay approximately one million dollars for the barge. The proposition was presented as an exclusive listing agreement between Debtor and MB Barge in which MB Barge retained the exclusive rights to list and approve the sales of the barges, and $318,208.90 of the sale proceeds would be paid toward MB Barge's claims against Kudzu once it sold. (PEX 6). Disputing the amount it owed to MB Barge, Kudzu refused to sign the agreement and the negotiations failed. On October 26, 2012, MB Barge sent a letter to Kudzu threatening a lawsuit if Kudzu disposed of any assets before resolving its claim with MB Barge. On October 31, 2012, MB Barge filed its lawsuit against Kudzu for the breach of the bareboat charter agreements.

SFB was aware of Kudzu's financial issues, but desired to continue using the 1801 as they had all along. Knowing Kudzu was attempting to liquidate its assets, Mr. Brito suggested that Bunkers purchase the 1801 and continue to charter the barge to SFB. The principal of Bunkers is John Canal, who is also the principal of Lanac. In December of 2012, William Gotimer, attorney for both Lanac and Bunkers, began negotiations to

purchase the barge.  Mr. Canal testified that Mr. Gotimer was authorized as Lanac's agent to negotiate the purchase of the 1801 from Kudzu.

<u>Negotiations Surrounding the Sale of the KDZ 1801</u>

In December of 2012, Mr. Gotimer began discussing the sale of the 1801 with attorney James B. "Jim" Newman, who represented SFB.  As part of the sale, they originally discussed by email that the 1801 must be free and clear of all liens, the SFB loan to Kudzu should remain in place as an offset to any judgment obtained by MB Barge, and that financing through Iberia Bank would speed the sale process.  (PEX 14 at 1-2).  They also discussed whether the 1801 would be rechartered to SFB and whether Kudzu had the financial capability to declare bankruptcy.  (PEX 14 at 1-2, 5-6).  The idea behind the sale was "to have New Iberia [sic] release the individual guarantors and Specialty as guarantors in return for a better credit and a commitment to repair the vessel to class status ($50K) and an assignment of the charter hire between the new owner and Specialty.  This will assure New Iberia [sic] that the vessel has been repaired, will be insured, will be maintained and [it] need not rely on a guarantee for payment."  (PEX 14 at 1-2).

In February of 2013, Mr. Gotimer discussed with Sara Shipman-Myers, an employee of SFB, Lanac's intent to charter the 1801 back to SFB on favorable terms and to give SFB the right to purchase the vessel for fair market value at the end of the term.  In March of 2013, Mr. Gotimer discussed financing with Iberia Bank, which required local participation of SFB or Mr. Brito to go forward.  During the financing negotiations, Iberia Bank's Vice President of Commercial Banking mentioned MB Barge's potential summary judgment ruling to Sara Shipman Myers and that it posed potential challenges

6

for Iberia Bank, and that it would be best to "proceed with the sale/payoff in order to pre-empt any judgment issues." (PEX 15 at 15).

On February 20, 2013, Alex Lankford, counsel for Kudzu, received an offer to purchase the 1801 from Graestone Logistics for approximately $500,000. (PEX 10). Mr. Lankford conveyed this offer to SFB lawyer Jim Newman indicating Kudzu's intent to enter into an agreement with Graestone. Mr. Lankford also requested the fair market value of the barge noted in the latest survey, (PEX 15 at 7), so the barge could be sold at fair market value "thereby relieving Kudzu of its obligations on the loan (and satisfying the mortgage on the barge) and relieving Kudzu's shareholders of their personal guarantees on the loan." (PEX 15 at 6). The Graestone offer fell through and Lanac continued negotiations to purchase the barge.

By May 25, 2013, Lanac's negotiations with Iberia Bank had completely fallen through, so Mr. Gotimer sought financing with ServisFirst Bank. During those negotiations, Mr. Canal estimated to ServisFirst that the barge would be worth more than $1 million after necessary repairs were made and the COI was brought current—a statement that Mr. Canal testified was mere puffery for the sake of securing financing, and not a personal valuation of what he thought the barge was worth at the time it was purchased, or even after it was repaired.

Satisfactory financing terms between Lanac and ServisFirst were secured, and included a guarantee of the loan by Mr. Canal and Bunkers, as well as a requirement that there be an additional guarantee from someone local to Mobile, Alabama. (PEX 14 at 63-64; JEX 10 at LANAC 0417-18; JEX 11 at LANAC -1171). Mr. Brito, concerned that his guarantee on Kudzu's mortgage was already dangerously close to default, agreed

to be the local guarantor. Guaranteeing the loan with Lanac allowed Mr. Brito to limit his financial exposure by avoiding payment or default on his Kudzu/Iberia Bank guaranty, and, Lanac's payment of the Iberia indebtedness would release the Kudzu shareholders from all guaranties on the barge. Mr. Canal testified that Mr. Brito was not compensated in any way for his participation in the transaction. When the Trustee questioned why Mr. Brito's guaranty was kept confidential from the other Kudzu shareholders, Mr. Canal stated that it is Lanac's policy to not disclose loan terms to sellers. The negotiations of the 1801 concluded on May 30, 2013, when Lanac bought the 1801 and the Sandra Ann for $493,126.61. (JEX 2). Kudzu shareholder Steve Wilson admitted that Kudzu did not inform MB Barge of the negotiations or the sale of the 1801.

After the Sale

At the time of the sale, the 1801 had been out of service for a year and was not purged of toxic gases, a process referred to as "gas-freeing" in the industry. As it was, the Coast Guard would not certify the barge for its intended use. Thus, sometime between June and mid-July of 2013, the barge was taken to Henry Marine in Coden, Alabama and was gas freed. Mr. Henry testified that after the Coast Guard inspected the 1801, the Coast Guard notified Lanac in a letter dated March 5, 2014, that it did not meet double hull standards under the Oil Pollution Act of 1990, and, the Coast Guard would consider it a single hull vessel. (DEX 9).

With there being no work in the area for single hull vessels, Lanac permitted Henry Marine to hire a naval architect to resolve the hull issues. Over the course of the next year, repairs were made in accordance with the Coast Guard recommendations to

Case 15-00148   Doc 59   Filed 03/13/17   Entered 03/13/17 15:42:06   Desc Main
Document   Page 8 of 31

classify it as a double hull vessel, and the permanent COI was issued on October 23, 2014. (DEX 5). Mr. Henry testified that the approximate cost of repairs made to the 1801 was $93,770.74. (DEX 5). The vessel has been in service since that date. (DEX 5 at LANAC 351). The total amount expended by Lanac to purchase and repair the 1801 was $520,872.95. Despite being operable, Mr. Canal testified that to date, the 1801 has not been profitable due to its age because many major oil company ports will not accept older barges like the 1801. The barge is now chartered with Atlantic Gulf Bunkering, and significantly, was never chartered to SFB.

On November 24, 2014, Lanac established a line of credit in the amount of $3,000,000.00 with Israel Discount Bank of New York and executed a First Preferred Fleet Mortgage to secure the line of credit. Part of the security for this line of credit was the 1801. Using the First Preferred Fleet Mortgage monies, Lanac paid off the ship mortgage of ServisFirst on the 1801. Mr. Brito's personal guaranty of the ServisFirst loan was then released without him making any payments on that guaranty.

Appraisals Summary

Eight appraisals were submitted to the Court for consideration in valuing the barge. No single appraisal was persuasive enough for the Court to rely on it more than the others in assigning value. Some appraisals were almost irrelevant due to when they were generated, some were unpersuasive due to the lack of current personal knowledge of the barge by the appraiser, one had a significant variation in the cargo capacity of the 1801, and at least one was unclear as to whether the USCG COI had expired and whether the estimated cost of all repairs was included in its valuation. A summary in chronological order by date is as follows.

The Shiffer-Beebe April 17, 2009 Survey appraised the fair market value of the barge at $1,433,000.00. Beebe, Sr. testified that the barge had been well maintained by its previous owner and was in above average, almost like new condition with a useful life of twenty years and suitable for the route and service intended. (PEX 4). This survey is only relevant as to the condition of the boat when it was purchased by Kudzu.

On December 29, 2010, Beebe, Jr. surveyed the barge and appraised the fair market value at $630,000.00 with a replacement value of $2,000,000.00. The survey noted that the deck and sides and end coatings were in very good and good condition, respectively. (DEX 2). This survey is unpersuasive because it was issued in 2010, approximately three years before Lanac purchased the barge.

On October 29, 2012, Mr. Schiehl performed a table top valuation[4] of the barge. At that time, the barge was undergoing Coast Guard certification. The fair market value of the barge was redacted, but Mr. Schiehl noted that the vessel was well-maintained and appeared to be suitable for its intended purpose. (PEX 9). The timing of this survey, some 6 months before the barge was sold, as well as its redaction of value, makes this survey less persuasive.

On May 6, 2013, twenty-four days before Lanac purchased the barge, Beebe, Jr. performed another survey of the 1801. He boarded the vessel at Eagle's Landing in Mobile, Alabama. Both Plaintiff and Defendant submitted this survey into evidence. In Plaintiff's exhibit, the fair market value is redacted (PEX 12 at 6); in Defendant's exhibit, the fair market value is $590,000.00 (DEX 1 at 6), and a replacement value of

---

[4] A table top valuation is not always based on personal knowledge of the condition of the vessel. Essentially, one surveyor boards the vessel to formulate an opinion as to condition only, and then another surveyor uses that appraisal to extrapolate and assign value to the vessel.

$2,000,000.00 was noted in both exhibits. (PEX 12 at 5, DEX 1 at 5). Beebe, Jr. testified in his deposition, that when he conducted this appraisal, he believed the COI was current, and that he did not know the COI had expired. (DEX 7 at 42, 43). He also testified that Sara Shipman Myers gave him a punchlist of repairs (which she obtained from Kudzu shareholder Bobby Tompkins), but that he did not know whether the repairs were completed or just contemplated since he did not enter the internal cargo compartments of the barge. (DEX 7 at 45). Though this survey is the most relevant in time and personal knowledge of all of the surveys presented, it is nonetheless unpersuasive because it is based on two flaws: that the COI was current, and that Beebe, Jr. was uninformed as to the status of the repairs. Beebe, Jr. admitted in his deposition that his appraised value of the barge would be different if he had known that the COI was expired and whether the repairs were complete or just contemplated. Therefore, the basic assumptions of this survey are too uncertain to make this survey reliable in determining fair market value.

On August 21, 2013, two months and twenty-one days *after* Lanac purchased it, and after some repairs were completed, marine surveyor Christopher Collier boarded the barge and found it to be in in above average condition for its age and service, suitably equipped and in suitable condition for continued service as a coastwise tank barge. (DEX 4 at 8). The 1801 had a temporary COI at the time this survey was completed. Mr. Collier appraised the fair market value of the 1801 at that time to be $625,000.00.

On December 18, 2013, approximately six months after the barge was sold, George Stone and Fred Budwine generated an appraisal of value on the barge, (hereinafter the "Budwine survey"). Mr. Stone boarded the vessel and found its condition to be in generally fair order and fit for its intended route and service. (DEX 3

at 8). The temporary COI was set to expire on July 31, 2014. Using Mr. Stone's opinion on condition, Mr. Budwine assigned $700,000.00 as the fair market value with a replacement value of $1,700,000.00. It is undisputed that the 1801 has a cargo capacity of 18,000 barrels, but this survey indicates a cargo capacity of only 13,000 barrels. The record is unclear whether Mr. Budwine based his valuation on this error, or if it is just a typo. This survey is unsigned by either George Stone or Fred Budwine. (DEX at 8). Because this appraisal was generated after Lanac purchased and made repairs to the barge, and because the survey contains an error in cargo capacity, the Court finds this survey less relevant in determining fair market value.

On January 21, 2014, Mr. Shiffer and Beebe, Sr. reviewed the 2009 Shiffer survey and the 2012 Schiehl report and concluded that the barge had more than twenty years of useful life with a fair market value of $1,200,000.00 and a replacement value of $2,250,000.00. (PEX 19). This appraisal is lacking in that Beebe, Sr. did not board the vessel himself to survey its condition, nor did he rely on a current survey performed by Shiffer, Schiehl or anyone. Instead, he merely reviewed the other previously performed surveys, assumed that the barge was similarly maintained in the interim, and based his valuation on that assumption. Therefore the Court does not rely on this survey.

On August 3, 2016, in preparation for this trial, Mr. Shiffer and Beebe, Sr. issued a table top supplement to the joint 2009 Shiffer-Beebe, Sr. Report referenced above. Mr. Shiffer and Beebe, Sr. met and reviewed their own prior appraisals as well as the appraisals performed by Beebe, Jr. and the Budwine Survey referenced above. At the time this supplement was issued, the COI had expired, but Shiffer and Beebe, Sr. concluded that the barge was in good order regardless. To calculate the current value of

the barge, they estimated the cost of the repairs recommended by Beebe, Jr. to be $68,630.00. They deducted the cost of those repairs and concluded the fair market value was not less than $1,131,370.00. (PEX19). The Court finds this appraisal supplement unpersuasive as it was performed approximately three years after the transaction was completed.

## Conclusions of Law

Plaintiff's Complaint requests relief under 11 U.S.C §§ 548(a) and 544(b)(1). Under either statute, the party alleging the fraudulent conveyance bears the burden of proof by a preponderance of the evidence. *In re Vista Bella, Inc.,* 511 B.R. 163, 192 (S.D. Ala. 2014). Here, that party is the Chapter 7 Trustee. The Court will address actual fraud first, and constructive fraud second.

## Count Three: Actual Fraud

Section 548(a)(1)(A) states in pertinent part that the trustee may avoid any transfer of a property interest belonging to and incurred by the debtor if the transfer was made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became" indebted to on or after the date that such transfer was made. 11 U.S.C. § 548(a)(1)(A). "Actual fraud denotes the actual mental operations of intending to defeat or delay the rights of the creditor." *Vista Bella* at 193. The phrase "actual intent to hinder, delay, or defraud" is established by circumstantial evidence. *Vista Bella, Inc.,* 511 B.R. 163, 194 (S.D. Ala. 2014). That evidence is established by certain "badges of fraud" as set out by the Eleventh Circuit in *In re XYZ Options, Inc.,* 154 F.3d 1262, 1271 (11th Cir. 1998). "No specific combination of badges is necessary for a finding of actual intent, and the presence of any of the badges of fraud does not compel such a finding."

Case 15-00148   Doc 59   Filed 03/13/17   Entered 03/13/17 15:42:06   Desc Main
Document   Page 13 of 31

*Vista Bella* at 194. "The badges merely highlight circumstances that suggest that a transfer was made with fraudulent intent." *Id.* "With that being said, it is clear that actual intent to hinder, delay, or defraud is a heavily fact-dependent question and generally comes down to the credibility of the witnesses." *Id.* at 193, 195. "Although part of the Alabama Code, [the badges of fraud] are appropriate to use to determine if there is a fraudulent transfer under federal law." *Id.* The badges are as follows:

> 1. The transfer was to an insider;
> 2. The debtor retained possession or control of the property transferred after the transfer;
> 3. The transfer was disclosed or concealed;
> 4. Before the transfer was made the debtor had been sued or threatened with suit;
> 5. The transfer was of substantially all the debtor's assets;
> 6. The debtor absconded;
> 7. The debtor removed or concealed assets;
> 8. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;
> 9. The debtor was insolvent or became insolvent shortly after the transfer was made;
> 10. The transfer occurred shortly before or shortly after a substantial debt was incurred; and
> 11. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.* at 194. The Court will only discuss the badges of fraud that are relevant o the circumstances of this case.

### Badge One: Transfer to an Insider

The Trustee contends that the sale of the 1801 was an insider transfer because the transfer to Lanac was less than arms-length and designed to confer future benefits in the 1801 on Kudzu shareholder, Javier Brito. (Doc. 53 at 4). The Court does not find that the transfer was made to an insider.

An "insider" is defined, among other things, as a director, officer or general partner of the debtor; a person in control of the debtor; or a partnership in which the debtor is a general partner. 11 U.S.C. 101(31)(B). Black's Law Dictionary defines an "insider" in the bankruptcy context as "[a]n entity or person who is so closely related to a debtor that any deal between them will not be considered an arm's length transaction and will be subject to close scrutiny." *Id. See also* Black's Law Dictionary 798 (7th ed. West 1999).

Though Mr. Brito is an insider of Kudzu, he is not an insider of Lanac; and, Lanac is not an insider of Kudzu. The fact that the transaction through ServisFirst required a personal guaranty by someone local, which turned out to be Mr. Brito, does not by itself establish that Lanac's purchase of the barge was not at arm's length. Furthermore, the evidence, as presented, proved Mr. Brito received nothing more than the other Kudzu shareholders: a release of their guaranties and the Iberia Bank mortgage. Thus, the Trustee has failed to establish that badge one exists.

<u>Badge Two: Post-Transfer Retention or Control of the Property</u>

The Trustee relies on the emails between Mr. Gotimer and counsel for Iberia Bank proposing that SFB will "soon own the barge" (PEX 21) and that SFB would be the end user of the barge, all of which were conditions required by Iberia Bank for it to finance the purchase. The Court is not persuaded by this evidence. Those emails represent negotiations relating to a deal with Iberia Bank that never took place and are thus, irrelevant in determining fraud as to *this* sale. The purchase was not financed through Iberia Bank, and the evidence did not establish that either SFB or Mr. Brito ever used the barge after Lanac purchased it. The fact that an unexecuted draft option

agreement for Mr. Brito to purchase the barge from Lanac at the end of the loan term is in evidence does not establish that SFB retained control of the barge after Lanac purchased it. Just as the failed negotiations with Iberia Bank are irrelevant to this inquiry, so is the unexecuted draft option agreement.

The Trustee also asks the Court to infer that the non-production of the "Duplex" attachment to Mr. Gotimer's email, which allegedly contained the documents evidencing a side deal between Lanac and Mr. Brito, establishes that Mr. Brito or SFB retained control of the barge or conferred future benefits on Mr. Brito for less than fair market value. (Doc. 53 at 5). The Court disagrees. The evidence merely established that there was an attachment to an email between Mr. Gotimer and counsel for Mr. Brito titled, "Duplex," which contained Mr. Brito's personal guaranty documents, as well as some "other documents," which were to remain confidential from the other Kudzu shareholders. The "other documents" were not presented into evidence by either of the parties. It is not the duty of the Court to infer or speculate what the evidence might prove if it had been presented. If the Trustee wished for the Court to consider any documents included in the Duplex attachment, she should have requested that they be produced and presented them at trial. Because the Trustee failed to produce the contents of the Duplex attachment, this Court will not infer what those documents establish. Therefore, this Court finds that the Trustee failed to prove that Mr. Brito retained the barge or exerted control over the barge after it was sold.

## Badge Three: Concealment of the Transfer

The Trustee contends that the draft option agreement, which she refers to as the "side agreement" with Mr. Brito was concealed from the other Kudzu shareholders, and

the sale altogether was concealed from creditor MB Barge thereby lacking the hallmarks of forthright honesty in fact. (Doc. 53 at 5). This Court disagrees. As stated above, by failing to produce the Duplex documents, the Trustee has failed to establish the existence of an untoward "side agreement," and thus, any reliance on such is unfounded. As to whether the sale of the barge was concealed from MB Barge, the Court finds that Mr. Gonsoulin knew the barge was for sale. This knowledge is evidenced by the exclusive listing agreement proposed to Kudzu by MB Barge, which Kudzu rejected, as well as Kudzu's offer to pay a commission to Mr. Gonsoulin if he found a buyer for the barge.

As for the nondisclosure of Mr. Brito's guaranty, the court finds this irrelevant as to concealment of the transfer. Nevertheless, Mr. Canal testified that it is Lanac's policy to not disclose loan terms to sellers, thereby giving this nondisclosure a bona fide, legitimate purpose. *In re Int'l Mgmt. Assoc., LLC*, 2016 WL 552491 (N.D. Ga. Feb. 10, 2016)(*citing In re Polaroid Corp.*, 472 B.R. 22, 35 (Bankr. D. Minn. 2012). This Court thus finds that transfer was not concealed, and the Trustee has failed to carry her burden of proof on badge three.

<u>Badge Four: Threat or Existence of Suit</u>

It is undisputed that all parties knew of the lawsuit filed by MB Barge against Kudzu. Therefore, the Court finds that this badge has been established.

<u>Badge Five: Substantially All Assets Transferred</u>

Kudzu shareholder Steve Wilson testified that once the 1801 and the Sandra Ann were sold to Lanac, Kudzu owned no other assets. Thus, badge five has been established.

<u>Badge Eight: Consideration Received Was Less Than the</u>

<u>Reasonably Equivalent Value of the Asset</u>

The Trustee contends that the purchase price paid by Lanac for the barge is not the reasonable equivalence of the fair market value of the 1801. Lanac disputes this allegation and contends that it paid fair market value for the barge. As discussed below as it relates to constructive fraud, this Court finds that the purchase price of the 1801 did not reflect the fair market value of the barge at the time of the sale. Therefore, badge eight has been satisfied.

### Badge Nine: Insolvency At the Time of or Shortly After the Transfer

It is undisputed that Kudzu was experiencing financial woes prior to the sale of the 1801. If Kudzu was not insolvent before the transfer, then it became insolvent when it filed for Chapter 7 relief within the succeeding ninety days. Badge nine has been established.

### Badge Ten: Substantial Debt Incurred Shortly Before or After the Transfer

The Trustee alleges that Kudzu was attempting to avoid the attachment of MB Barge's potential judgment lien by selling the last of its assets and filing for bankruptcy before the summary judgment motion was ruled on. The Trustee relies on an email from Iberia Bank's Vice President of Commercial Banking to Sara Shipman-Myers (employee of SFB and Mr. Brito), stating that the "summary judgment timeline is going to present a challenge for us. . . It would be my recommendation to go ahead and proceed with the sale/payoff in order to pre-empt any judgment issues. . . ." (PEX 15 at 15). During trial, there was no showing that MB Barge would have won or did win on its motion for summary judgment, and the Court will not speculate as to such. The Trustee has failed to establish that badge ten applies.

Case 15-00148    Doc 59    Filed 03/13/17    Entered 03/13/17 15:42:06    Desc Main
Document      Page 18 of 31

Having considered the relevant badges of fraud set out in *Vista Bella,* the Court finds that eight of the eleven badges are applicable to this set of facts, with the presence of only four badges having been affirmatively established by the Trustee. There is no specific combination of badges necessary to find actual fraud. *Vista Bella* at 194. The finding is highly factual and determined on a case-by-case basis. *Id.* Considering the evidence as it relates to each badge of fraud, this Court finds that actual fraud does not exist regarding the sale of the 1801. All of the "evidence" the Trustee relies on relates to the negotiations of a deal with Iberia Bank that never even happened. The Trustee also relies on "evidence" she did not produce: the contents of the Duplex attachment, and then asks this Court to speculate what *may* have been proven if the attachment had actually been produced. As a general finder of fact and seeker of truth, this Court does not engage in speculation or conjecture and refuses to do so here. This Court saw no evidence of actual fraud, and as such, this Court finds that the badges of fraud that are present do not add up to actual fraud.

## Count Two: Section 544(b)(1) Avoidance of Fraudulent Transfer

"Section 544(b) gives a trustee the ability to avoid any transfer of an interest of the debtor in property that is voidable under applicable nonbankruptcy law by a creditor holding an unsecured claim that is allowable under the Bankruptcy Code." *In re Vista Bella, Inc.*, 511 B.R. 163, 193 (Bankr. S.D. Ala. 2014). In this case, the Trustee invokes the Alabama Uniform Fraudulent Transfer Act ("AUFTA"), Ala. Code § 8–9A–1 et seq., as her nonbankruptcy law of choice. The badges of fraud necessary to determine actual fraud under the Bankruptcy Code are the same badges necessary to determine actual fraud under the Alabama Uniform Fraudulent Transfer Act. As such, the Court finds a

separate analysis for recovery under Section 544(b)(1) is unnecessary. The reasoning set out above as to Count Three of Plaintiff's Complaint is hereby adopted and dispositive regarding the actual fraud allegations in Count Two of Plaintiff's Complaint.

Count One: Section 548(a)(1)(B) Constructive Fraud

Section 548(a)(1)(B) states that the trustee may avoid any transfer of an interest of the debtor in property, if the debtor voluntarily or involuntarily—

> **(B)(i)** received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> **(ii)(I)** was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>> **(II)** was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>> **(III)** intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>> **(IV)** made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).

"Constructively fraudulent transfers require not only a lack of reasonably equivalent value, but also, for the most part, that the transaction leave the debtor financially vulnerable. As a result, the trustee may not avoid a transaction simply because it was for less than a reasonably equivalent value. The debtor must also be in one of three fragile financial conditions: insolvency; possessing an unreasonably small capital; or believing that the debtor would incur debts beyond its ability to repay after the transaction. If a transaction leaves the debtor in any one of these conditions, and if the transaction was for less than a reasonably equivalent value, then fraud is presumed; no evidence of the debtor's intent is required." 5-548 Collier on Bankruptcy P 548.05.

"Reasonably equivalent value ("REV") is not specifically defined in the Bankruptcy Code." *Vista Bella* at 197. "However, the purpose of the requirement is well known: 'to protect creditors against the depletion of a bankrupt's estate.'" *Id.* (*citing In re TOUSA, Inc.,* 680 F.3d 1298, 1311 (11th Cir. 2012); *In re Rodriguez,* 895 F.2d 725, 727 (11th Cir. 1990)). "Therefore, § 548(a)(1)(B) 'does not authorize voiding a transfer which confers an economic benefit upon the debtor' because 'the debtor's net worth will have been preserved, and the interests of the creditors will not have been injured by the transfer.'" *Id.* (*citing Rodriguez,* 895 F.2d at 727). "The pivotal question asks what value a debtor received from a transfer." *Id.* "The Bankruptcy Code defines "value" for § 548 purposes in § 548(d)(2)(A), to include 'property, or satisfaction or securing of a present or antecedent debt of the debtor.'" *Id.* The fact the Debtor "ultimately landed in bankruptcy does not preclude a finding that value was not given, even if the value increased the debtor's insolvency." *In re PSN USA, Inc.*, 615 F. App'x 925, 932 (11th Cir. 2015). "A determination of whether value was given under [§] 548 should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise." *Id.*

To determine whether a debtor received REV, this Court has adopted the three part test set out by the Northern District of Georgia: "(1) whether the debtor received value; (2) whether the value received was in exchange for the property transferred; and 3) whether the value was reasonably equivalent to the value of the property transferred." *Vista Bella*, 511 B.R. 163, 197 (*citing In re Knight,* 473 B.R. 847, 850 (Bankr. N.D. Ga. 2012). A dollar-for-dollar transaction is not required, nor is strict market equivalence of the transferred property and the received consideration. *Id.*

Case 15-00148   Doc 59   Filed 03/13/17   Entered 03/13/17 15:42:06   Desc Main
Document     Page 21 of 31

This Court finds the first two factors have been sufficiently met. First, Kudzu received value as defined by the Code: "value" for § 548 purposes in § 548(d)(2)(A), to include "property, or satisfaction or securing of a present or antecedent debt of the debtor." *Vista Bella, Inc.* at 197. "Value includes the mere opportunity to receive an economic benefit in the future." *Vista Bella* at 203 (*citing In re Fruehauf Trailer Corp.,* 444 F.3d 203, 212 (3d Cir. 2006)). Whether value was received at all is a threshold question resolved by the court's determination of whether "based on the circumstances that existed at the time of the transfer, it was legitimate and reasonable to expect some value to accrue to the debtor." *Id.* Because the sale of the 1801 released Kudzu's antecedent debt with Iberia Bank, value was received by Kudzu and the first factor is satisfied. Second, the value received by Kudzu (release of the Iberia Bank mortgage) was given by Lanac in exchange for the 1801 and the Sandra Ann, thereby satisfying the second factor.

The parties dispute the third factor of whether the value given was the reasonably equivalent value of the property. The Trustee proposes the Court rely on appraisals submitted by Beebe, Sr., and Mark Schiffer which value the barge at three different time periods at over $1,000,000.00 thereby demonstrating the $460,711.64 purchase price paid by Lanac was less than reasonably equivalent value. In contrast, Lanac contends that appraisals submitted by the Trustee are flawed in that neither Beebe, Sr., nor Mark Schiffer have surveyed, or even seen, the barge since 2009 and thus, their estimates of value do not adequately reflect what the barge was worth at the time Lanac purchased it. Additionally, Lanac contends that its appraisals conducted by Beebe, Jr., Christopher Collier, and Fred Budwine, and the lack of other better offers demonstrate the purchase

price was sufficient for this Court to find that reasonably equivalent was given by Lanac. While this Court agrees with Lanac that the Trustee's appraisals are indeed flawed, it does not agree that reasonably equivalent value has otherwise been established. As previously addressed, every appraisal submitted lacks a relevant piece of the puzzle in determining fair market value.

The purchase agreement for the 1801 states a total purchase price of $460,711.64. Even if the Court were to give the most weight to the lowest-value appraisal of $590,000.00, the evidence shows that Lanac still paid $129,288.36 less than the barge's appraised value. An approximate $129,000.00 difference is too great for this Court to find that reasonably equivalent value was given. The Court recognizes that Lanac purchased the barge in significant disrepair, and spent approximately $93,770.74 in repairs to make the barge operable again. Factoring the cost of repairs, the purchase price is still $35,517.62 less than the lowest appraised valuation.

In situations like this, the market is a better indicator of value than relying on multiple, widely varying appraisals. Trying to properly weigh the evidence and assign a value based on eight disparate appraisals makes the valuation process more arbitrary than this Court can accept. The eight appraisals entered into evidence range in value from $590,000.00 to $1,433,000.00. The purchase price of $460,711.64 clearly falls below this range. Consequently, the Court is unable to conclude that Lanac paid a reasonably equivalent value for the barge.

Turning to the remaining elements of constructive fraud under § 548(a)(1)(B), the Court finds the only element that applies is subsection (B)(ii)(I): that the debtor was insolvent on the date that such transfer was made or such obligation was incurred, or

became insolvent as a result of such transfer or obligation. Section 101 of the Code defines insolvent as "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation . . . ." § 101(32)(A). Kudzu shareholder Steve Wilson testified that Kudzu never operated at a profit and that Kudzu had no other marine assets once the Sandra Ann and 1801 were sold. On behalf of Lanac, Mr. Gotimer testified that he knew Kudzu would have no marine assets left after Lanac purchased the Sandra Ann and the 1801. The Court finds that Kudzu either was or became insolvent when the transfer occurred. Accordingly, both elements of constructive fraud are satisfied and this Court finds that constructive fraud exists.

Good Faith Defense

Lanac defends against the Trustee's allegations entirely by raising the § 548(c) value and good faith defense. The Trustee points out in her post-trial brief (Doc. 53 at 13), that Lanac failed to raise this affirmative defense in its answer, and thus cannot avail itself of the statute's safe harbor.[5]

Federal Rule of Civil Procedure 8(c), as made applicable to bankruptcy proceedings by Rule 7008 of the Bankruptcy Rules of Procedure, sets out a non-exhaustive list of defenses that must be pled in the affirmative. The purpose of Rule 8(c) is to give the opposing party notice of the defense and a chance to argue why the defense lacks merit. The general rule in federal court is that a party's failure to plead specifically any affirmative defense will result in waiver of that defense. However, this Court joins

---

[5] *See* 5-548 Collier on Bankruptcy P 548.09; *Bayou Superfund LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)*, 362 B.R. 624, 631 (Bankr. S.D.N.Y. 2007) ("The good faith/value defense provided in section 548(c) is an affirmative defense, and the burden is on the defendant-transferee to plead and establish facts to prove the defense.").

those other courts that have held the general rule is not hard and fast, but instead discretionary. *U.S. v. Miss. Vocational Rehab. For the Blind,* 794 F. Supp. 1344, 1353 (S.D. Miss. 1992)("federal caselaw [sic] recognizes the role of judicial discretion in waiver determination. Where the matter is raised in the trial court in a manner that does not result in unfair surprise, . . . technical failure to comply precisely with Rule 8(c) is not fatal"). In its Answer, Lanac pleaded its Fourth Defense to state that, "[t]he amount paid in exchange for the barge reflected market conditions at the time of the sale, and is therefore not inadequate consideration for the sale; such that Kudzu cannot prove any fraudulent conveyance or transaction." (Doc. 9 at 2). Analyzing this defense in the context of the evidence presented, this Court finds that even though the words "good faith" were not expressly stated in the Fourth Defense, good faith was nonetheless sufficiently pled to put the Plaintiff on notice that Lanac intended to present evidence that the transfer that occurred between it and Kudzu was proper, or in other words, in good faith. *See Mickowski v. Visi-Trak Worldwide, LLC*, 415 F.3d 501, 506-07 (6th Cir. 2005). Accordingly, the Court will consider Lanac's good faith defense.

Section 548(c) allows a party to obtain good faith transferee status where the transferee proves by preponderance of the evidence that it took the asset for value and in good faith. If this status is proven, the good faith transferee is allowed to retain "a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation."[6] § 548(c). "The good faith test under § 548(c) is

---

[6] It has already been found by this Court that Kudzu received value as defined by the Code in § 548(d)(2)(A). Further analysis at this juncture is unnecessary. *See* analysis of reasonably equivalent value, *supra,* p. 21.

generally presented as a two-step inquiry. The first question typically posed is whether the transferee had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose." *In re Int'l Mgmt. Assocs., LLC,* 2016 WL 552491 (Bankr. N.D. Ga. Feb. 10, 2016)(*citing In re American Housing Foundation*, 544 Fed. App'x. 516, 520 (5th Cir. 2013)(*citing Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC* 439 B.R. 284, 310-12 (S.D.N.Y. 2010). "Once a transferee has been put on inquiry notice of either the transferor's possible insolvency or of the possibly fraudulent purpose of the transfer, the transferee must satisfy a 'diligent investigation' requirement." *Id.*

The Fourth Circuit Court of Appeals held that "in evaluating whether a transferee has established an affirmative defense under Section 548(c), a court is required to consider whether the transferee actually was aware or should have been aware, at the time of the transfers and in accordance with routine business practices, that the transferor-debtor intended to "hinder, delay, or defraud any entity to which the debtor was or became . . . indebted." *In re Taneja*, 743 F.3d 423, 430 (4th Cir. 2014) (*citing* 11 U.S.C. § 548(a)(1)(A);*Goldman v. City Capital Mortg. Corp. (In re Nieves)*, 648 F.3d 232, 238 (4th Cir. 2011)). In *Taneja,* the Fourth Circuit found its prior § 550(b)(1) good faith analysis in *Nieves* applicable to good faith under § 548(c). This Court is persuaded by the reasoning employed by the majority of the Forth Circuit Court of Appeals and holds that the § 550(b)(1) "knew or should have known" good faith standard adopted in *In re Nieves* is applicable to the good faith defense analysis under § 548(c). A party cannot discharge its burden of demonstrating good faith through willful blindness to information

that would otherwise put the party on notice of fraud. *See In re Bell & Beckwith*, 838 F.2d 844, 850 (6th Cir. 1988); *Goldman*, 648 F.3d at 242.

Applying the law set out above, and considering that the testimony and evidence presented at trial, this Court finds that Lanac conducted itself in good faith in purchasing the 1801. Considering the first prong of the good faith analysis, this Court finds that Lanac was on inquiry notice as it had sufficient information relating to the Debtor's financial status that it knew or should have known of the potential insolvency of Kudzu.

The Trustee asks this Court to adopt a reading of § 548(c) which would preclude any finding of good faith if the transferee knew or should have known of the Debtor's insolvency. This Court does not agree with the Trustee's rigid definition, instead it agrees with the many courts that have noted good faith is not "susceptible of a precise definition"[7]

After approximately four months of negotiations with Kudzu's counsel, Lanac requested that Beebe, Jr. appraise the barge a mere three weeks before the transaction was finalized. Lanac relied on this appraisal (albeit a faulty appraisal) in establishing the price it was willing to pay for a barge in disrepair with an outdated COI. The fact that the appraiser made incorrect assumptions about the value of the barge should not be held against Lanac. The testimony and evidence presented at trial establish that Lanac negotiated extensively with Kudzu, sought out the best financing terms for the purchase, had an independent appraisal of the barge conducted before the purchase, and, notwithstanding knowledge of Kudzu's financial situation, conducted an arm's length

---

[7] *In re Fair Finance Co.*, 2014 WL 7642447 (N.D. Ohio July 30, 2014) (*citing Hayes v. Palm Seedlings Partners–A (In re Agric. Research & Tech. Grp.*), 916 F.2d 528, 536 (9th Cir. 1990) (*quoting Consove v. Cohen (In re Roco Corp.*), 701 F.2d 978, 984 (1st Cir. 1983)).

Case 15-00148   Doc 59   Filed 03/13/17   Entered 03/13/17 15:42:06   Desc Main
Document    Page 27 of 31

transaction in purchasing the 1801. Lanac's adherence to reasonable business practices, despite not paying reasonable equivalent value for the barge, is sufficient for this Court to conclude that this transaction is an arm's-length transaction. Therefore, this Court finds that Lanac acted in good faith. To find otherwise would risk an inequitable and unnecessarily punitive result based on conduct that occurred in good faith, but was based on wrong or faulty information. *See, e.g., In re Taneja,* 743 F.3d at 433(Fourth Circuit upheld bankruptcy court's good faith finding based on the seller's lawyer's assurances to the buyer that the transactions were arm's-length when the buyer expressly asked if the transactions were fraudulent).

In conclusion, the Court finds that because Kudzu was made insolvent by the transfer, and because Lanac did not give reasonably equivalent value for the barge, constructive fraud exists.[8] However, despite this finding of constructive fraud, the Court finds that Lanac is nonetheless entitled to good faith transferee status and a lien on the barge under § 548(c).[9]

## The Trustee's Recovery

Once fraud is established, the Trustee may recover the property transferred or the value of the property transferred under § 550. The Code does not provide any guidance on when a court should order a monetary judgment as opposed to the return of the

---

[8] Because the analysis for constructive fraud under state law is the same as under the Bankruptcy Code, a discussion as to constructive fraud under the AUFTA will not be discussed.

[9] The main difference between the defense of section 550(b) for subsequent transferees and the defense of section 548(c) is that section 550(b) is a complete defense to recovery of the property transferred or its value. That is, once the transferee shows good faith, value given and a lack of knowledge of the avoidance, the trustee may not recover anything from that transferee. Under section 548(c), however, the transaction is still avoided, but the transferee is given a lien to the extent value was given in good faith. 5-548 Collier on Bankruptcy P 548.09

Case 15-00148    Doc 59    Filed 03/13/17    Entered 03/13/17 15:42:06    Desc Main
Document    Page 28 of 31

property, only that a court must issue a "single satisfaction." § 550(d). Bankruptcy courts have discretion whether to award the trustee recovery of the property transferred or the value of the property transferred. *In re Taylor,* 599 F.3d 880, 890 (9th Cir. 2010). The factors which a court should consider in determining whether to order turnover of the property rather than payment of the property's value include, whether the value of the property is (1) contested; (2) is not readily determinable; or (3) is not diminished by conversion or depreciation. *In re Centennial Textiles, Inc.,* 220 B.R. 165, 177 (Bankr. S.D.N.Y. 1998) (*citing In re Aero-Fastener, Inc.,* 177 B.R. 120, 139 (Bankr. D. Mass. 1994). The factors are written in the disjunctive; therefore, all three must not be present for a court to order turnover. Here, two factors are present: the value of the barge being highly contested, and it's value being not readily determinable based on the appraisals submitted. As such, this Court finds that there is a sufficient lack of evidence as to the value of the barge such that an order to return and sell the barge is necessary.

Section 550 provides that an estate may recover the full value of an avoided transfer because § 550 is designed and intended to return the bankruptcy estate to the financial position that it would have been in had the fraudulent transfer never occurred. *In re Consolidated Yacht Corp.*, 337 B.R. 711 (Bankr. S.D. Fla. 2006)(*citing, Morris v. Kansas Drywall Supply Co., Inc., (In re Classic Drywall, Inc.)*, 127 B.R. 874, 876 (D. Kan. 1991). One component of that analysis is § 550(e), which permits the recipient of the fraudulent transfer to recover monies it expended to preserve the transferred property, if, and only if, the transferee accepted the transfer in good faith. Section 550(e) is applicable from an equitable perspective because § 550 is intended to return the debtor to

the position it would have been had the transfer not occurred—not to return it to a better position. *Id.* at 714.

As previously stated, "good faith" is not a defined term in the Bankruptcy Code, and is properly determined on a case-by-case basis. This Court has found that under the unique circumstances of this case, Lanac is a good faith transferee and thus, § 550(e) is available to Lanac. Section 550(e) gives teeth to the good faith defense by allowing the transferee a lien to secure any net consideration the transferee gave in improving, repairing and preserving the property transferred, or if less, the increase in value of the property caused by the improvement, such as paying taxes or discharging superior liens. *See* 5-550 Collier on Bankruptcy P 550.06. "The amount of the lien is limited to the lesser of two amounts: (1) the transferee's cost incurred in making the improvement (less any profit realized by or accruing to the transferee from the property); or (2) any increase in the value of the property resulting from the transferee's improvement." *Id.* "'Improvement' is defined in section 550(e)(2) to include: (1) physical additions to the property, (2) repairs, (3) payment of any tax on the property, (4) payment of any debt secured by a lien on the property that is superior or equal to the trustee's rights and (5) preservation of the property." *Id.* In order to apply Section 550(e) to determine the amount of Lanac's liens, the Court will set this matter for an evidentiary hearing by separate order.

<u>CONCLUSION</u>

Having considered the pleadings, the credibility of the testimony and the evidence presented at trial, as well as the parties' post-trial submissions, the Court concludes that actual fraud as alleged by the Trustee simply did not exist, but that constructive fraud due

to a lack of reasonably equivalent value was present during the transfer of the 1801.

Despite the existence of constructive fraud, Lanac established that it acted in good faith during the transaction, thereby securing it a §§ 548(c) and 550(e) lien for its purchase price and the costs of improvements. The amount of the lien shall be determined by an evidentiary hearing on damages. Lanac is ORDERED to remove the barge from service and hold the barge in trust until the amount of the lien can be determined and the barge sold by the Trustee at public auction.

    Dated: March 13, 2017

JERRY C. OLDSHUE, JR.
U.S. BANKRUPTCY JUDGE

Case 15-00148    Doc 59    Filed 03/13/17    Entered 03/13/17 15:42:06    Desc Main
Document      Page 31 of 31